Call the first case. The estate of Scott Douglas v. Sybaris Clubs International. So please step up and identify and then give me a breakdown on how you're going to break down, at least on the one side, your testimony. Since I see there's three on one. Good morning, Judge. I'm Richard Burke for the Plaintiff Appellant. I would expect, assuming we get 20 minutes, I would use 15 and save 5 for rebuttal. Okay. Your Honor, I'm William DeYoung. I represent one of the defendants, Howard Levinson, the individual in this corporation, ARC. And again, assuming if you would give our side 20, we three, who are going to argue, would divide it up at 7 minutes each, approximately. All right, as best you can, because we've got three cases today. Okay. And the second one is going to be a nightmare in time, I can see. One thing I would mention, there are four parties, and Jared Schneider is here, but he's not going to argue today. His partner that wrote the brief and was most involved in the case passed away just about four weeks ago, Jeff Hoff. And he would argue, but I'm prepared to argue whatever he covered. Oh, I remember you. I know you. I remember you from one of the others. Yeah, you and I, we've been on almost every single one. Right. There's been a few. That's right. So anyway, he's here to help if necessary, but otherwise just the three of us will argue. All right. Your Honor, my name is Joe Bosco. I'm going to represent HK Gold Eagle. Good morning, Your Honor. Mike McGrory. I represent Cassandra Community Center. Okay. All right. When you're ready, proceed. Thank you, Judge. May it please the Court, good morning, Your Honors. Once again, Richard Burke and my colleague, Chris Riddle, on behalf of the plaintiff appellant, Mrs. Garland. Judge, as you know, we are here on plaintiff's negligent entrustment claim that was dismissed pursuant to a grant of summary judgment by Judge Sulkanik in the trial court. And that claim is actually one that Your Honors addressed in a prior opinion back in 2014 and actually found that there was a genuine issue of fact for the plaintiff to proceed with a negligent entrustment claim against Mr. Levinson and Mr. Knutson, the two owners of the plane. And, therefore, it's certainly our position, Judge, that the law of the case really precludes the defendants from raising the arguments that they have that the ---- Garland, too, addressed it and said, so you're going down a road that isn't fact. Garland, too, clearly stated that this was not addressed. Okay. Well, Judge ---- Remember, this is the sixth or seventh case of ---- Yes. So I'm through this. So you've got to come up with something new to get anywhere this time. Okay. And certainly I appreciate what you're saying, Judge. Regardless of that issue, I believe the reason we are now here, even though Your Honors ---- We're saying that either might have established negligence, but you've never tied it together because our feelings are you can't establish that. Okay. Your Honors did say there were certainly genuine issues of fact that we could proceed on and ---- That's as far as we went. Yes, exactly. And I think we're here, though, today, Judge, because in one of your opinions, and, in fact, the one in which you sent the case back on with respect to the negligent entrustment count, the Court included a comment or a sentence that essentially said, we will never know everything that occurred in the aircraft that night. And I believe that the defendants have taken that sentence to create arguments and theories that there is no possibility for the plaintiff to prove a claim of negligent entrustment or that any testimony or expert opinion about the cause of the crash would be speculative. And I do not believe Your Honors intended that to be the import or meaning of that sentence, but it has taken on that effect and given rise to arguments by the defense that everything is speculative about why the plane crashed. And I believe Judge Soganic also got drawn into that thinking, and I suggest inaccurately or improperly, and basically struck many of our experts' opinions because he believed they were speculative and relied and even quoted Your Honors' comment that we don't know everything that went on in the cockpit that night. And I don't believe Your Honors would have sent the case back on the negligent entrustment claim if you really thought there was no possibility of it being proven. But in reality... Counsel, what evidence did you establish in the record that goes beyond pilot negligence to specific negligence by the pilot that can be attributed to his lack of training, his lack of experience, that made it negligent to entrust the plane to him? Judge, I think, number one, I don't think there has to be a specific act of negligence foreseen by the entrustor that specifically gives rise to the reason the plane crashed. Rather, the case law, the Evans v. Shannon case and other cases, it talks about the inexperience, recklessness, lack of licensure, that type of thing, Judge. So I think it's a broader category. But you agree you have to show more than negligence by the pilot, right? You have to show that the pilot did something that was attributable to his lack of experience, his lack of training, whatever. Yes, and Judge, there is ample evidence that he allowed the speed to degrade down to 82 knots when the proper landing speed, according to the manual, is 103 knots. One of the owners, Mr. Levinson, testified he lands at 110 knots. We have evidence, despite not knowing everything that went on in the cockpit. There were radar data points that picked up evidence about the flight path. It was able to determine what the plane's speed was at the last place or point it would record data, and it was down to 82 knots, which is lower than the stall speed and certainly lower than the recommended landing speed. But are any of these, I mean, you cite a bunch of them, but can you show any one of them is in evidence, is the cause in fact? Well, I think certainly, Judge, if you're at the stall speed, if the pilot, Mr. Turek, who's operating the plane has allowed the plane to fly so low and so slow that it stalls, that is, in fact, evidence of negligence. But you don't have the cause in fact. It's almost as though by you citing so many, you defeat your case. Because you're saying there's 10 different of these, what one is it? You've got to give us evidence of what it was. Judge, if I'm understanding you correctly, I mean, what it was... Not the way you're stating it. The way you're stating it, we don't disagree with you. What we're saying, though, there has to be evidence in fact, specific evidence. Yeah, and I think that specific evidence comes from the radar data evidence that the pilot flew this plane too low and too slow and allowed it to stall and therefore crashed. That is documented evidence from the NTSB. Okay, but it's a two-part thing, right? You do have to show that the pilot did something wrong. But you also have to, because this is not a vicarious liability case. You're not saying the defense are liable for everything the pilot did wrong. It's a negligent entrustment case, right? So you have to show, I think, to show proximate cause on a negligent entrustment case, not only that the person to whom it was entrusted made mistakes, but that those mistakes were directly attributable to the things that should have been known about him, right? You should have known he might do this because you knew he lacked this training or something. So you're telling us that the speed was, he was flying it too slow and too low. How does that tie in to what the defendants, the defendants now on appeal here, should have known about Turek? Because, Judge, they should have known that he was not current to be flying the plane at night and therefore he should not even have been operating the plane as the pilot in command. So not being able to fly at night led him to fly too slow? No, it caused the defendants to entrust the plane to somebody that wasn't capable and qualified. Counsel, I'm trying to make myself clear. No, I am following you, Judge. You can't just tell me that Turek was negligent, right? Right. Don't you agree with me on that? You have to tie his negligence to something that made it, you have to tie the negligence to the entrustment. I mean, he wasn't trained, according to you, to fly at night. Okay, but is that why he flew too slow? Because he hadn't flown a plane at night? Judge, I think there's at least a, I think it is one of the contributing causes and gives rise to evidence that more likely than not it is a contributing cause. Because if he wasn't current with his biennial flight review, he wasn't current with night flying, therefore he shouldn't have been flying the plane. And the one main point, Justice, is that if defendants, and especially Levinson, had simply asked if he was current or checked his logbooks, they would not and should not have ever given him the plane, and therefore this pilot is never in the position of flying this plane. And then secondly, with respect to Mr. Knutson, there's evidence in the record that Knutson, the other owner of the plane, he told his friend Bill McGuinn when they got out to Kansas that turret's flying skills were not up to par. And so he literally was articulating disapproval to some extent with turret's flying ability, but nevertheless let him fly the return leg of the flight. So I do think that connects the negligent entrustment with poor flying by turret. So that would probably apply to all of the acts of negligence that you're alleging against turret, right? You would just say generally this guy was not ready to be flying this plane. Yes, in conjunction with the fact that we have presented evidence through expert opinions, some of which were stricken, that there was very distinct operational differences between the plane turret normally flew, the Beach Baron, and this Cessna. And it made a difference in the maneuvering and the landing pattern, and all of that we believe our experts showed contributed to the crash. Getting back to Justice Ellis' question, don't the cases say that when you have a negligent entrustment case, you've got to tie that into the cause of the accident? For example, there's a comment, he's a hot shot, he flies too fast. Now, if he had landed too quickly and caused a crash, wouldn't we have a different case than where we have now where we're talking about him coming in too slowly? Judge, that would certainly be different. But I do have to say, I don't think the case law is that specific that there has to be a specific observable deficiency known to or identified by the entrustor that gives rise as a specific cause of the crash. I mean, otherwise, I think that's a burden. And I know the defense's claiming exists. They don't cite any case law that supports that. I think that is too high of a burden and standard. Well, then how do you distinguish negligent entrustment from vicarious liability? Because, I mean, if it was vicarious liability, then anything Turek did wrong, the defendants are on the hook for. It doesn't matter any other kind of a link. They're just liable for anything he did. But that's not your case here, right? Because here, judge, in negligent entrustment, they had the opportunity not to give him the plane. And because of knowing or should have known that he was not eligible and qualified to operate as a pilot of command. And therefore, as the owners, they had to make sure they were entrusting their plane to somebody that was capable and legally qualified to be the pilot in command. And, judge, your honors, I don't think you can lose sight of the fact that in a negligent entrustment case, the very point is that the aircraft or a car, whatever it may be, should not, if it wasn't entrusted to the operator, in this case the pilot Turek, the crash never takes place. And I don't think we can, you know, fail to give sufficient recognition of that. Because it is the act of entrusting the plane that is the first contributing cause. And the incident never happens if they had not entrusted the plane. So for those reasons, judge, and I think that negligent or I think ultimately the court's time spent on considering opinions to be speculative based on your honors' comment many years ago about not knowing everything in the cockpit, that gave rise to, judge, so organic, striking expert opinions that I think there was adequate basis for based on the information we do have from data points about the height off the ground and the speed of the plane. And that, too, then gave rise to the summary judgment motion. So I probably have consumed a good amount of time, and I will with that, judge, unless you have any other immediate questions, reserve some time for rebuttal. Okay. Thank you. Good morning, your honors. Again, my name is Mike McGrory. I represent the estate of Knutson in this case. My brief here focused primarily on the rulings on the plaintiff's experts that Judge Sloganek made, and that's what I'll mostly discuss. But if I have time, I will touch a little bit on the race-hips-a-locator argument. But first, I want to address a couple of things that Mr. Burke had mentioned. Number one, one thing that sort of stuck out in me after Mr. Burke's presentation is he said that the case law is not that specific with respect to what is required for causation in negligent entrustment cases. And that's not true. Evans, the Supreme Court in Evans, was very specific. And they said, in fact, and this is a quote, one of the primary considerations in negligent entrustment is whether the user's incompetency was the approximate cause of the accident. And that's what you see here, and you saw that throughout Mr. Burke's presentation and in the briefs filed by plaintiffs, is this avoiding that issue. And your honors caught on to that, so I won't belabor the point, but there's just zero evidence whatsoever that any of the alleged incompetencies that Turek suffered from, whether it's lacking a biennial flight review or not being night current, what have you, there's no evidence linking that to the crash. Mr. Burke mentions data points repeatedly. Well, the data points show us that the plane crashed. We all know that. We know it stalled and it crashed. What the data points don't show us is what happened in that cockpit, what was going through Mr. Turek's mind at the time he was flying, why he flew too slow or too low if that's what he did. Any number of things could be there. And that's what Mr. Burke is sort of skipping that element, and your honors caught on to that. So, again, I won't belabor the point, but I did want to mention that. I also want to talk a little bit about Mr. McGuinn's testimony. Mr. Burke brought that up as well. And the one thing I want to point out about Mr. McGuinn is that I think this is an effort, as the Court will remember, negligent supervision has been carved out of this case, carved out years ago by this Court. Citing to Mr. McGuinn, and his conversation occurred with Mr. Knudson in Kansas City, so it was midway through the trip. The entrustment by that point had already occurred. So in citing Mr. McGuinn, what the plaintiff is saying is not that Mr. Knudson or H.K. or whoever should not have entrusted the airplane to Mr. Turek. He's saying that they should have taken the airplane away. And that's supervision. That's saying that Mr. Knudson should have watched Mr. Turek the entire flight, should have observed how he was flying, what he was doing, and had some sort of responsibility to take the airplane away at some point. Again, that's supervision. That's not negligent entrustment. The only way to look at it as an entrustment is there's an entrustment every second of that flight, which is sort of an absurd way to look at it. And the fact is that Mr. Knudson was a passenger on this airplane. He didn't have a duty to check the weather. That's the pilot in command's job. He didn't have a duty to determine what time they'd be arriving and make any plans if it was going to be at night. Again, that's the pilot in command's job. The airplane was within Mr. Turek's control at that point. One more thing about Mr. McGuinn's testimony is that it's sort of exaggerated when Mr. Burke explains it and when they summarize it in the briefs. Knudson's comments relate to takeoff procedure. This crash implicates his approach and landing procedures. There's no red flag there. There's no indication that Mr. Knudson ever said anything to Mr. McGuinn that he was unsatisfied or felt in danger when he was flying with Mr. Turek. Mr. McGuinn was very clear in his testimony that Knudson never said he felt Mr. Turek was incompetent. So there's really nothing here. It's a red herring in a way. And so I'll talk a little bit then about the expert admissibility issues. As this Court is well aware, the trial judge has broad discretion with respect to evidentiary rulings. Judge Sulganic analyzed each and every one of the opinions set forth by plaintiff's two experts. I think there was 27 of them. And he literally went through them one by one, and he ruled on them one by one. He granted the motion to strike with respect to some of them, denied the motion to strike with respect to others, and said he'll allow others to stand pending plaintiff's counsel's ability to link it to a causation at some later date. Counsel, is abuse of discretion a standard even in summary judgment? It is, Your Honor. And, you know, I'm glad you mentioned that because that is one thing I wanted to discuss real fast. There is some case law that suggests that when an evidentiary expert ruling is made in conjunction with a summary judgment ruling, that a de novo standard applies. These rulings here were not in conjunction with one another. Just some quick background, I guess. On return from this court last time we were here, sent back to the trial court, we filed a motion to strike the expert opinions. We didn't know about them. We didn't learn about them until the motion to dismiss were being briefed. Those were briefed separately and before the summary judgments were briefed. They were ruled on separately and ruled on before the summary judgment were briefed. They were never taken in conjunction with one another. And the relief we saw in the motion to strike. What was the context in which the motion to strike was made after 213 answers were given? Yes. Well, what happened was when we filed our motions to dismiss, which we won and we reversed in this court, plaintiff filed his expert affidavits and disclosures with his response to those motions to dismiss. We prevailed on that motion, so I had no reason at that time to move to strike them. When this case got sent back from this court, back to Judge Sloganick, we moved to strike the expert opinions. And we asked that they be stricken for all purposes. It wasn't limited to summary judgment. This was a case management motion. We wanted to get rid of them for purposes of trial, purposes of motions to eliminate, for purposes of everything that was coming up. And they were decided separately. And Judge Sloganick, I don't believe in his summary judgment ruling, ever mentioned or relied on the expert ruling so much. So, you know, the cases that discuss that sort of hybrid standard on appeal in summary judgment instances, I'll say in conjunction with. And when you read the opinions that the appellate court has issued on those cases, they're all in conjunction, taken at the same time with, ruled on in the same ruling. In this case, they're separate issues. And I just want to check my time real quick. And I think that's, yeah, that's almost at seven minutes. So that's all I have, unless Your Honors have any questions for me. No, thank you. Thank you very much. Very disciplined of you. Good morning, Your Honor. Joe Bosco again. My presentation, I'd like to concentrate on the first two of the three elements of the seminal case of Evans versus Shannon. That is the requirement that Mark Turk was unlicensed, incompetent, or reckless, and the defendant knew or should have known and thereby negligently entrusted the aircraft. I know that my colleague, Mr. DeYoung, is going to follow up and discuss the proximate causation issue. Evans also established a red flag test as well, and holding that unless the entrustor knows or has reason to know that the entrustee is unlicensed, incompetent, or reckless, the entrustor has no duty of further inquiry. I think that all of this is extremely important with regard to seeing whether or not plaintiff has met his burden in establishing evidence, which is different than where we were before in this case when we were here in 2014. There was allegations that were admissible, and also there was experts' opinions that were stricken since we've been here. But the evidence shows that Turk was competent, careful, and trained and checked. And it's not only what he did, but it's what Mr. Levinson and Mr. Knutson knew that he did, and what their perception of his competency was. And in this case, they were neighbors and hangermates. Mr. Turk had his own multi-engine aircraft at Milwaukee Airport. They knew that he flew in and out of there. They knew that he was intimately experienced with landing at Milwaukee, the landing pattern at Milwaukee, performing the exact same maneuver that he was performing on the night of the accident. And the evidence shows that he had over 1,000 multi-engine hours. In September of 2005, Turk successfully completed 33 hours of extremely thorough, recurrent twin-engine instrument proficiency at Glass Simulator Center. We have sites to those in our record. In my brief, Gene Littlefield, his instructor, testified that he flew with him both in an airplane and a simulator. He was a very proficient instrument pilot, very comfortable with him. Quote, I can never recall a time Turk wasn't in charge of the airplane. He could handle emergencies. He was good with cockpit management, good with airspeed. He did excellent approaches. Turk did not show a propensity to slow airspeeds. That's on C-20, 2059, and C-430, 35, and 2073. This resulted, this training, in Turk obtaining an instrument proficiency rating in his logbook, following the instrument proficiency. Did the defendants know this information? It was, yes. This is all information you're giving us in hindsight. Yes. No, they did know that because they, Mr. Levinson, in fact, Mr. Levinson and Mr. Turk, Mr. Knutson, went through the same training at GLAS and also at RTC, which I'm going to talk about, and they knew what it consisted of. And, in fact, there's testimony in the record that Mr. Levinson called Mr. Littlefield prior to the day of this accident to ask Mr. Littlefield what he thought about Mr. Turk, and Mr. Littlefield said he was a fine pilot. He would make a fine pilot. So he did check up and he did know. What about the lack of familiarity with systems? Well, with regard to that, the next issue, the next training that he had was at recurrent training, RTC. That specific course was specifically designed for Mr. Turk to transition. He was already a multi-engine aircraft rated pilot and actually was already FAA approved to fly this particular aircraft, but he went above and beyond and he went to RTC and was specifically designed to transition him to this specific make, model of aircraft, to transition him into a 421, a Cessna 421B aircraft. That's what this training was consisted of. And Mr. Babbitt, who was his instructor at the time, we have testimony that he talked about Turk making various approaches. He was diligent, competent, proficient in these maneuvers, that he had no concerns with Turk flying a 421, and he did not have any problems or speed with power settings in the airport environment. And the defendants knew this information, too? Yes, yes. They knew that they knew... His resume is one thing, but it's what the defendants knew. And the defendants knew that he went through the RTC training. The defendants knew he successfully completed the RTC training, and the defendants knew, having gone through the same training themselves, what that training consisted of. And Mr. Babbitt has testified that when pilots such as Turk leave RTC, quote, they are proficient to operate the aircraft. That's at C1915. And they did not need any further training, C1915. This is an FAA-certified trainer whose specific job is to transition this pilot into this particular aircraft, and he says that Mr. Turk was competent to fly this aircraft. This is, we should stop right here, because according to the FAA-certified pilot training program that he completed before this accident, he was competent and he was qualified to fly this airplane, and that's what the defendants knew. Furthermore, he went further. In the week before the accident, Mr. Levinson, who is also a CFI, certified flight instructor, spent five hours of instruction time with Mr. Turk, where they flew in this exact aircraft, in this exact pilot, in this exact airport, and they performed these exact maneuvers. They, Mr. Levinson saw Mr. Turk perform all of these the Friday before the Monday of the accident, and he testified that he had no problems with Mr. Turk's performance. Based upon that, there is no question, there is no evidence, first of all, that Mr. Turk was in any way unqualified or incompetent to fly this aircraft, but the second prong, there is absolutely, even if there is a question of fact with regard to that level of element, there is absolutely no question that the defendants, Mr. Levinson and Mr. Knutson, were unaware of any unqualification or incompetency. In fact, all of the evidence they had was that he was competent and qualified to fly this airplane. I don't know how I'm doing on time. I think I'm just a little bit over right now. Again, I don't want to impede on my colleagues' time or your time. If there's any other questions, I'd be happy to take them. If not, I'll sit down. Thank you. Thank you very much. May it please the Court, I'm William DeYoung. I represent Howard Levinson, one of the entrustors of the aircraft, one of the owners of HK. By the way, HK Golden Eagle stands for Howard and Kent, just as an aside so you know that. They formed a corporation, and their corporation is a defendant, and that's HK Golden Eagle. So I represent one of those defendants. I have brought up some charts from documents that exist in the record that I'd like to talk about right away, because I'd like to get to some of your questions. I'd actually like to address your questions before I do anything that I was going to present. One of the things you asked was were they aware of things. I think one of the things I thought about, Mr. Burke said in his argument, that had he looked at the law book, he would have known things. By he, I think he really means Howard Levinson. Howard Levinson was the person that was most closely working with Mr. Turek before he took the airplane. Howard Levinson flew with Mr. Turek for five hours in the plane, the very plane, and concluded those five hours of flights. And the reason we know it's five is because they were adding it up to equal five. And they wanted it to equal five in the actual airplane, because that was a goal that they had because the insurance company required that. So in addition to having the specialized training, they additionally wanted to have the special training in the airplane. Howard Levinson, my client, who is a certified flight instructor, participated in that. They concluded doing that five hours on Friday, Friday afternoon. This flight, the fatal flight, was on Monday. Monday morning, they flew to Kansas City. Monday evening, they were flying home. When they flew home, there was the crash. So up to that Friday, Howard Levinson was doing the five hours, and he had accomplished the five hours on that Friday. Now, he mentioned, had he looked in the law book, what would he have known? Well, what he would have seen is a couple of things right here that we've learned from the law book. This is in the record from Mr. Turek's law book, C1837, Volume 2. These are two endorsements that are in the back of the law book. It may be hard for you to read, but I can read them, and I will read them to you. The first most significant endorsement is this one right here. This endorsement right here is from a flight instructor named Lew Wipotnick, and it was given and put in his law book on the date of October 31, 2004. On October 31, 2004, Lew Wipotnick, a flight instructor at Pell Walkie, flew for 3.2 hours with Mr. Turek for the purpose of giving him his flight review. The contention that he lacked his flight review is false, and had he looked in the law book, it would be right here. Now, someone might say, oh, that's a question of fact, because somebody is saying he didn't have it, and somebody else is saying he did have it. Well, this isn't a very significant question of fact, because this is what the defendants would have thought. This is what the defendants would have known had they looked in his law book, and indeed, I'm absolutely positive they talked to him about it, because this is the type of thing they would have done. Now, how can I say that? Because the truth is, when Mr. Turek went down to RTC, he filled out a pilot history form, and he said he had this. He talked about having this at RTC. By the way, he went to RTC early in January, the same January of 2006 in which the crash happened. So he said he had it. He did have it. Had they looked at the law book, and we don't know if they did or didn't, but they would have seen this. What this says right here is that according to Advisory Circular, FAA Document 61-91H, Paragraph 7A, I have that in the record. That exact thing is in the record. It says he must complete three hours of flight training in order to complete his biannual flight review. There it is right here. Okay, he did it. The three hours is in his law book. So he doesn't lack it. He did not lack it. This is the flight training completed. Now, you need to know about the date. This date, 10-31-2004, is one year and one half before the time of the crash. The FAA requirements are that you have it every two years. So every 24 months you must have it. So this makes it timely. He would absolutely have this at the time. He did have it, and it was in his law book. Interestingly, on the same page right here is another endorsement that the pilot had, which they would have seen if they looked in his law book, which is the endorsement he got when he was at Recurrent Training Center, RTC, on January 8th, about 20 days before the crash. On January 8th, 20 days before the crash, RTC here signed his law book endorsing the fact that he had satisfactorily completed an instrument proficiency check, according to the FAA regulation 6157. He was instrument competent and qualified and legal at the time, and this says it right here. Okay? They know that RTC gives you these things, because they went there. When I say they, both, it's in the record, both Mr. Turek, I'm sorry, oh yeah, Mr. Turek did, just before the accident, but Mr. Knutson and Mr. Levinson both had previously gone to RTC. That's why they recommended it to him. They know they give you this. They're thankful of giving you this. Now, RTC didn't give him this because he already had it. He didn't need it. That's in the record, too. Testimony in the record. Why didn't you get the flight review, which is separate from the proficiency check? The flight review is for all pilots. This one right here is for instrument pilots, slight difference. But both are required. Both are available to be obtained at RTC. They send them there not only for training to transition from one plane to another, specific type training, but additionally they knew he could get both of these. It's in the record. This is there. Additionally, this is at C-1281. This is the FAA's certification that Mr. Turek had completed just before the time of the crash, the FAA WINGS program, which says right in the regulations, 61-56, that this completes your flight review requirement. This is demonstrated evidence that he had properly completed it. Again, we're not arguing this is a question of fact because our experts say he didn't have it. Okay, you could say, well, isn't that a question of fact, Mr. DeYoung? No. We're not arguing for that reason. We're arguing that this is what these gentlemen would have known. One thing Mr. Berkshire said is had he asked him, he should have asked him. Well, had he asked him, this is what he would have said. The date of this document is February 6, 2006. This was issued by the FAA approximately seven days after the crash. It's an interesting fact, but it means he had it in the records. Now, where would this be found? This was normally issued, comes in the mail, went to his house. It was produced in Discovery. How would a person know about this? You have a website that the FAA pilots put in the information. The FAA monitors it and maintains it. That's modern. It's not all in the logbook anymore. We all know this. It's an online FAA program where they keep track. You also put in the fact that it was flying with this instructor, and that's where you should look if you want to find out if they had a flight review. Well, those are two documents that demonstrate that it was currently in place. The only other way in which it needs to be current, and used as the word current generically, is with language. We talk a lot about language. It's kind of important to talk about language because they're making an issue of it, and I want to talk about it. These are the documents that come from Arkansas. These are their documents. These are the records that, to answer your question, no, Mr. Levinson and Mr. Knutson would not have access to these documents, but they would know this is what takes place there because they did it themselves. What I'm here to show you in the records are all the landings that took place at night in the simulator at RTC. We've highlighted them. In this one page, there are four landings that executed in a flight training device, FTV, flight training device, during the hours that are shown, signed by flight instructors, and this flight instructor right here, James Babbitt, testified under oath that he always sets the simulator for nighttime. He does it because that's the policy of the place. He set it for nighttime. That makes these night landings. These night landings were executed on January 8th, 20 days before the accident. There's four of them on this page alone. He needs to have three in the last 90 days. They would have understood he would have obtained this. They did it themselves. Again, they're not inquiring. They're not looking. These came by subpoena, but the gentleman would have understood by sending him there. If he doesn't have it already, he's going to get it. They also understand that when you go there, one of the things this place does is they interview you and say, what do you need? What do you need? Here's what we're planning to do for you. What are your requirements? When's the last time you got your flight review? How are you doing on your landings? How are you doing on your instrument flying proficiency, the three subjects? That's all able to be accomplished there. The reason it is is because that flight training device is FAA inspected and approved as well as the syllabus. The syllabus is FAA approved as well. Why? Because that facility trains pilots who fly for hire, who must have this because Part 135, which is much more stringent, requires minimal training every six months. In order to obtain it, it's very good to obtain it in a simulator or a flight training device, but it has to be FAA approved. It's going to comply with the FAA requirements. That's the kind of facility they sent him to. He went there. This is why, in their mind, they thought he was eminently qualified. They thought he was eminently qualified in a regulatory way. They also thought he was eminently qualified because its specific purpose is to teach him the differences between his plane and the new plane. It's type-specific training. And I want to get particularly to the other question you raised, Mr. Justice, with respect to don't they need to have had some knowledge of an issue with respect to what caused the crash? My answer is yes to that, absolutely, because they need to be put on notice, according to Evans in the Illinois case law, that there's some issue that makes them incompetent or reckless or unlicensed. Okay. It doesn't mean you've made a mistake somewhere. It doesn't mean you... We all make mistakes. Pilots make mistakes. What you're looking for is incompetent, reckless, or unlicensed. Therefore, you should not entrust the plane. It's something that you have to see. You don't become incompetent because you made one mistake. You become incompetent because you keep making mistakes and you're indicating you're woefully not prepared. There's no evidence of that in this case. The evidence is the opposite of that case. I have a good analogy for you in that regard. You frequently sit in judgment of lower-level trial court judges. They make mistakes. Yeah, sometimes you say they made a mistake. That doesn't mean they're incompetent. For someone to say that judge is incompetent is a step way beyond, and that's what Evans says. Evans doesn't say he committed negligence, and you were getting at that when you were talking about vicarious liability. No, you need to be incompetent. Okay, let's talk about the specific thing he did wrong here, if we know it to be true. Taking the plaintiff's evidence that he got too slow and therefore stalled. That had never been demonstrated previously. No evidence in this case that that had ever been demonstrated. Instead, you have all of these landings at this facility in a flight training device that's checked to adequately simulate a 421B where he was competent. Now, these landings, these traffic patterns, these approaches are all to be conducted at the appropriate speed. That's one of the reasons he's there. Nobody says problems with speed control. It's not in here. It just doesn't exist. Additionally, Howard Levinson, as I mentioned, flew with him for the five hours. Statistically, from his logbook, which is in the record, we know that in those five hours, it was three flights. In those three flights, the first one consisted of seven landings in one flight. The reason there's seven landings in one flight is because they're going over and over and over again, the traffic pattern and landing in a 421. Howard Levinson and Mark Turk. Second flight, one landing. Third flight, the one I described happened on Friday before the Monday. Four flights. I'm sorry, one flight, four landings. You add that up, that's 12 landings, 12 traffic patterns the week before this crash. When Howard Levinson was deposed, they said, how did he do? Did you have any complaints? No, I did not. Did you think he'd be competent? I did. Did he show a problem with speed control? No. Did he show a problem with turns? No. Okay. That's what's involved in this case, according to the plaintiff. Speed control, problems with turns. I'd like to read from his experts one of his opinions they think is particularly on point. Mr. Lawrence, opinion number nine, which was stricken, says, in his opinion, what happened? Mr. Turk either tightened his turn to the point that he entered an approach turn stall, which means he turned too sharp, and then stalled, or increased the angle of attack and bank angle to the point that he stalled the aircraft. Angle of attack means pulled up, turned, and stalled. Either just turned too sharp, and stalled, or pulled up. This is his expert's opinion. He goes on, and this is really what got struck. Mr. Turk stalled his turn for final. You can tell that by where it crashed. That's fine. But here's what he goes on. More likely than not, Mr. Turk did not recognize the imminent danger posed by his poor approach to landing. Also, he did not want to ask for assistance from the man he was seeking to impress. So he continued the approach, and whether he simply slowed below stall speed or pulled the airplane into an approach turn stall, the results were the same. This was stricken by the trial court because, of course, what he's doing here is he's putting himself in the mind of the pilot and giving explanations of what he was thinking. This is exactly why he was stricken. He's doing this because this is what is necessary. This is what's missing. They're attempting to do it, but they can't. What they really need to know is why did he get slow. That's what you asked. You said, well, did the failure to have night currency, did that lead him to get too slow? It doesn't seem like it would. He doesn't really lack that. But the truth is that doesn't lead to you getting too slow. Why did he get too slow? Why did he turn too sharp? If he did get too slow and he turned too sharp, which he's saying it, did we ever have evidence of it in advance? Did Mr. Knudsen or Mr. Levinson ever get notice of this, such that they were concerned or red flagged or they knew it was likely, according to the cases, likely that he would do that? There's no evidence of that in this case because the evidence is the opposite. The evidence is on this subject, traffic patterns, speed control, turning,  and he's so thoroughly shocked in this regard. The 12 landings done in the week before the occurrence. A number of those landings were done at Milwaukee Airport, the very place where this accident occurred. Okay, so I believe that's really significantly irrelevant. And then finally, I guess I would say that recently the Barclay opinion came down. We provided it to the court as it came in as a decision after we'd filed our brace. We did it by motion. You granted our motion. The Barclay opinion is consistent with the opinions that we had cited to on causation. But it's really a very, very good case. I'd like to talk about it just for a second, then I'll be done. Because I'm arguing causation particularly. And by the way, I believe that we are entitled to summary judgment for two reasons. One, because of lack of evidence of causation. We don't know why he got too slow. But additionally, because they don't have evidence that we had some concern in advance that we should have had about the way he was flying. We had all kinds of evidence that he was flying well, particularly the type of flying and the specific thing that it's alleged he did wrong. Okay, Barclay, in essence, is a person who was intoxicated, went out on the deck of an apartment building behind the building, the stairway area. And because he was intoxicated, apparently he went over the railing and fell down a couple of stories and was killed. Later, it was found out that the railing was too low. The railing was supposed to be 42 inches tall and it was only 36 inches tall. There was an expert, and an expert testified that because the railing was too low and because of the height and weight of the gentleman who was intoxicated, it did not provide sufficient barrier for him to go over. This is a violation. This is the thing that was wrong. And he didn't know exactly why he went over, but he said, my opinion based on his weight and height and the too low of a railing, this too low of a railing, his center of gravity was too high and he went over. Okay, and then that was their complaint. The defendant was able to defeat the plaintiff on this case on the basis that, first of all, the expert did not know why he went over, precisely the same as our case. The expert does not know why he got too slow. The expert does not know why he stalled. There's no evidence in advance of why he would or that he likely would, precisely the same as Barclay. In addition, in Barclay, there was some possible possibility that he sat on the railing and he went over because he was sitting on the railing. Again, he's intoxicated. If he sat on the railing, it has nothing to do with the height of the railing or his center of gravity and going over. Okay. After identifying these two possibilities, the court went on and said, all about circumstantial evidence of what is necessary to prevail. I could read you many of those quotes, but I don't think I need to because they're the ones that you've seen many, many times in all the other cases we've cited. But I think Barclay is particularly on point. It's a February 2019 decision of the Illinois Appellate Court, Second District, that we provided. I think we need to be. Counsel, how specific does the defendant's knowledge have to be to be liable under negligent entrustment? Do they have to have specific knowledge before he gets on that plane? The Turk sometimes flew the plane too slowly? Or could it just be he's not an experienced enough pilot? I mean, that is a more generic thing to just say you're not experienced, but that would tend to lead you to be concerned with any number of things if you're just simply not experienced enough. I know you debate whether he was experienced enough, but that's essentially what they're saying. He didn't have enough training. He wasn't familiar enough with this type of airplane. If we assume for the moment that that's true, then how specific does their knowledge have to be? Isn't that enough to give them some idea that if something goes amiss up there, he's not going to be able to handle it? I don't know if it's going to be necessarily speed or distance from the ground or angle. Of course, I'm well over my skis now trying to talk about airplane stuff. Could it just be a more generic concern that he doesn't have the training and the experience and competence to be able to handle something if something goes wrong? I think that the answer to your question on that is two. First, I would say they would need enough to know that he's incompetent when he's operating this airplane. When you say how much, what should they know? I believe that if they have sufficient evidence that he's not competent in this airplane, of whatever kind it is, you don't give them the plane, and they shouldn't give them the plane because he's shown it over and over again. He's behind. He's not going to be good enough. If you get every single appeal from the same judge, and you're always reversing him, you could ultimately make a decision about that judge, you might be incompetent. It's not something you're inclined to do, but same analogy. So, yes, I think there can be unrelated, but it would have to be to the point of becoming incompetent, that you believe he's incompetent. Because that's what Evans says. That's what Evans requires, is that you can't just make a mistake. You have to be to the point where... What if they put him on the plane, and he'd never had any training at all? So he didn't have any evidence of incompetence. He hadn't done anything wrong, he just hadn't been trained. And you let him on the plane. Somebody entrusted an airplane to somebody who'd never flown it before, for instance. Yeah. And then they did something wrong. Something, yeah. Well, I think that's a different case, and that could be yes. I think the answer there could be yes, is that if you entrust this, and it's a different airplane than he's flown already, if it's a different airplane than he's flown already, and you've never worried about whether he's in any way adapted to this plane, and you never check him out, you never worry about it, you never inquire, and then he has an accident that, again, is because he's not ready, not because he was... One thing pilots sometimes do that causes a lot of accidents is they do this... It has to be something that's due to his late failure to be prepared. But, yes, I think that could be true, but the difference here is that's nothing like what we have here, because they really do a few things. Number one, they really believe he was prepared because of the specific schooling that's specific to the plane and the five hours of observing him afterwards in the plane. So five hours of observing him after he comes out of the school, and the school is only 20 days before, would give them the belief that he is going to be prepared. So then they watch him, and they don't see anything wrong. So when they don't see anything wrong in the five hours that you watch him, and you know he went to the school, you don't believe that he is behind the airplane, you believe he's competent to operate the airplane. Now let me talk about inexperience for a second, though. All pilots are taught that you don't always just go into every kind of weather or all kinds of circumstances. One of the things you're taught to become a pilot, particularly as you become an instrument pilot, a traveling pilot, in a very well-regarded traveling airplane, which you already owned, is you have to know your own limitations. So your own limitations are, today I'm tired. I'm not going to take on that difficult a flight. Today I don't feel well. I don't think I'm going to do that flight. Today I don't feel well, so I think I'm going to limit it to only daytime, because nighttime is harder. Pilots decide all the time, and there's a lot of regulations that require them to think like that as well. So the fact that possibly he may not have been totally as good as a pilot who had 300 hours on the airplane, that doesn't mean he's not competent to operate the airplane. It's up to him to decide what kind of flight he's ready for and what kind of flight he's not ready for. What I think the plane is trying to do here, when he talks about the specifics of this flight, is make us like his parent, or vicarious liability because he's like our employee. We're supervising him. You know, in the airlines, the airline pilots, they don't just get the weather. They have a dispatch service that tells them what the weather is and tells them whether they can go or not. They don't just trust those pilots to make that decision. The airlines divide that up, and it's done that way because it's required. Well, here, pilots have to make those decisions. Our guys have the right to rely on him to make a decision about how competent he was for each individual flight. They make the decision he's adequately adapted to this plane because of what he's done. So I believe that, yes, he could be less experienced than if he had 300, but then it's up to him to make that decision. The other thing I think you mentioned is the specific. Yes, the reason the specific is required is because they would have to see something that makes them be concerned about a safety that then was the cause. So they would have to say, oh, we shouldn't give him the airplane because he's likely to be unsafe. Okay, seeing a pilot make a takeoff that you don't agree with, that doesn't make a pilot unsafe. Seeing a pilot ride brakes, which was discussed and has been used from two years or three years earlier at another time doesn't make a pilot unsafe. Seeing something that makes you concerned about the pilot and then ignoring that, then you could negligently entrust him, and then if that had the causation. So I think your question about specific is relevant, too. I would say, yes, it needs to be specific because it could be you're always behind the airplane, which I dealt with at the beginning, but if it's not like that, then they'd need to see something specific. A good example, let's talk about this turn thing, where this expert talked about his tendency not to make too steep a turn, that he made too steep a turn. Had we seen that in advance? Had there been some evidence in the record that we knew he did this? We saw this. We corrected him over and over again. Then he did it again, and that was the cause of the crash. There's a specific that may have a different consequence in this case. But he's saying he thinks this is the cause of the crash. Okay, he thinks this is the cause of the crash, and yet there's nothing anywhere, anywhere that we saw that he was behind the airplane generally or that he did anything like this. So I'll wrap up right there. I think I've said enough. Hopefully I've addressed all your questions. Thank you. Thank you. Your Honors, inexperience is one of the elements of negligent entrustment, and I don't think it rises to the level of having to identify the specific manner in which piloting inexperience plays out. No different than in an auto negligent entrustment case. You don't have – you can see a person is not sufficiently experienced, yet I don't believe you have to foresee that they're going to cause an accident by either driving too fast or running a red light or not using a turn signal. So I don't think the case law is that specific that these defendants would have had to foresee the precise manner in which inexperience would have played out to cause this crash. Same with if you're underage or unlicensed, you still shouldn't be given a car. You don't have to foresee why being unlicensed would cause a specific means of resulting in an accident. Importantly, Judge, Your Honors, some of these documents, and perhaps all of them, are in the record. What is not in the record is the interpretation of the documents. Mr. DeYoung just gave you his interpretation of what those documents mean. There's no testimony from any witness about the WINGS program or the majority of those documents. They have no expert that has ever talked about the import or meaning. So I respectfully suggest that that testimony by Mr. DeYoung needs to be stricken. I don't think it's admissible. It is not found in the record. It is lawyer argument that is trying to be advanced as constituting evidence. Judge, regardless of what simulator training he had, and by the way, there's certainly testimony that the simulators are not aircraft specific, and also all these simulator owners said that they do not certify that a pilot is competent. They simply certify he completed the program. So that's important. None of them are saying this man's competent to fly any particular type of aircraft. The crash does occur at night, and he was not current with his night flights. Even if you wanted to accept what Mr. DeYoung was saying, that creates a question of fact, because our experts certainly say the opposite, that he wasn't current with biannual review or with night currency. Counsel, I don't want to belabor the point because we've been over this, but his inability to, his lack of keeping night current, I guess you'd say. Is there some indication, has there been some connection made between not being night current and flying the plane too slow? Perhaps not exactly with that, Judge, but what it does is it should have barred these two men from giving him the plane to fly. It's in the nature of being unlicensed, being unqualified to fly the plane. That's why they have the currency requirements, to make sure they're up to date. He was not qualified to be the pilot in command. That's the testimony of our expert. So that's the reason, Judge. And just a couple last points. Mr. Taylor only had 32 hours in a Cessna. He only had five hours with a flight instructor, and that came two or three days before the crash. And the reason Levinson was giving him the five hours is because he couldn't even qualify for insurance coverage without getting that. So Turek is not a man with any significant amount of experience flying a Cessna. He had only 32 hours logged and only five of which was with a dual instruction, with an instructor with him. So based on all of those facts, Judge, and we've been over it, but I think there's enough evidence that when he is not qualified to be the pilot in command, there's at least a genuine issue of fact as to whether he should have been given this plane, and the fact if he had not been given the plane, he's never flying it and it never crashes. And for those reasons, Judge, we think there is sufficient evidence to have precluded the granting of summary judgment, precluded striking our expert opinions. We would ask that those rulings be reversed and the case be remanded for trial on the merits. Unless you have other questions, I thank your honors for your time. Thank you all. It was actually very entertaining. Both sides made much more of interest in the briefs.  Thank you.